[Carroll v. The State.]

# Carroll *v.* The State.

*Trespass after warning, tried before a Notary Public and ex-officio Justice of the Peace, in pursuance of an act conferring jurisdiction of all misdemeanors upon justices of the peace in certain Counties.*

1. *Notaries public; origin and duties of the office; constitutional and statutory provisions.*—Notaries are of ancient origin, long known to the civil and common law. Statutes have been enacted regulating the manner of their appointment, and to some extent defining their duties, which were formerly strictly ministerial—not clothed with judicial power, nor charged with judicial duty. The Constitution merely recognizes the existence of the office and provides for the mode of filling it; it does not create the office.

2. *Same; power of appointment by governor; civil and criminal jurisdiction conferred.*—Under the Constitution, the governor has the power to appoint notaries public, conferring upon them only such powers as are appropriate to their office under existing law, or, in addition, the powers and jurisdiction of justices of the peace. In the latter case, the notary may exercise all the civil and criminal jurisdiction of a justice of the peace, as defined by statutes then existing, or thereafter enacted.

3. *Constitution; rule for construing.*—Many rules for the construction of statutes are of but limited application to the construction of the Constitution. The safest rule for construing the latter is to regard, not so much the form or manner of the expression, as the nature and object of its provisions, and the end to be accomplished, giving the words their just and legitimate meaning.

4. *Same; meaning of term "proviso."*—Because the term *provided* is used in a law it does not necessarily follow that the matter which may succeed it is a *proviso* in its technical sense; it is the matter of the succeeding words, and not the form, which determines whether it is or not a technical *proviso.*

APPEAL from the Circuit Court of Lee.

Tried before the Hon. JAMES E. COBB.

The appellant, C. A. Carroll, was tried, convicted and fined by one Thomas L. Kennedy, notary public, on a charge of trespass after warning. From the judgment of conviction an appeal was taken to the said Circuit Court, and a statement there filed by the solicitor, upon which the trial was had *de novo.* Said statement is as follows:

State of Alabama, } Circuit Court, Spring Term, 1877.
Lee County,

On appeal from the justices' court of Thomas L. Kennedy, notary public and justice of the peace, in and for said State and county, and beat number 2, the State of Alabama, by its solicitor, complains of C. A. Carroll, that within twelve months before the commencement of this prosecution, he did, without legal cause or good excuse, enter into the dwelling house, or, on the premises, of one Joseph Bar-

[Carroll v. The State.]

nett, after having been warned within six months preceding, not to do so, against the peace and dignity of the State of Alabama.

J. R. DOWDELL, Solicitor 9th Circuit.

To this statement the defendant demurred, alleging as grounds:

1st. That said statement shows that T. L. Kennedy, Esq., who acted as notary public, had no jurisdiction in the premises.

2d. Said statement discloses that the judgment of conviction, from which the appeal was taken by defendant, was rendered by a notary public.

3d. That the act of the Legislature, approved Feb. 8th, 1877, entitled "An act to increase the criminal jurisdiction of justices of the peace and notaries public having like powers, in the counties of Lee, Madison, Jackson, Clarke, Choctaw, Walker, and Marion," is unconstitutional and void, in so far as it relates to notaries public.

The same question as raised by demurrer was presented by motion to quash, and by motion in arrest of judgment. The motions and demurrer were overruled, and defendant excepted. Such ruling is now assigned as error.

J. M. CHILTON, for appellant.—1. Whether the notary had jurisdiction depends upon the validity of an act of the legislature, approved Feb. 8th, 1877.—Acts 1876-7, p. 197. For prior to this act, even if we concede that notaries had power of justices, they did not have jurisdiction of the offense here charged.—R. C. § 3932.

2. Without questioning the power of the legislature to confer upon *justices of the peace* the jurisdiction created by the act, we insist that the power does not exist to confer such jurisdiction upon notaries public. Section 26 of Article VI. of the Constitution of 1868, and section 13 of the same article of the present Constitution, are essentially alike, and refer to *civil*, not criminal jurisdiction. This has already been so held, as to that part of the sections referring to justices.— *Taylor v. Woods*, 52 Ala. 474.

3. The portion of the sections referring to notaries, as clearly relates to *civil* jurisdiction as what precedes. The two parts are connected by a *proviso*, the "natural and appropriate office" of which, is to limit what follows by what precedes.—*Rawls v. Kennedy*, 23 Ala. 240; *Pearce v. Bank Mobile*, 33 *ib.* 693.

4. Again, said section of the present Constitution provides that the jurisdiction authorized to be conferred upon notaries, shall be exercised within the precinct or ward for

which they are appointed—a feature entirely consistent with civil, but wholly inconsistent with criminal jurisdiction. For justices, while limited to their precinct, in civil matters, have criminal jurisdiction throughout the county.

5.   We refer to these sections, not as containing any limitation on the power of the legislature in the matter of conferring criminal jurisdiction, but simply as showing that they refer solely to civil jurisdiction, and contain no *grant* of criminal jurisdiction.

6.   The prohibition upon which we rely, is founded in section 8 of the "Declaration of Rights," Constitution of 1875. That section first asserts the general proposition, that for an "indictable" offense, no one shall be proceeded against by "information." Afterwards are mentioned the only exceptions to the general prohibition: "*Provided*, that in cases of petit larceny," &c., "and other misdemeanors, the general assembly may, by law, dispense with a grand jury, and authorize such prosecutions and proceedings before *justices of the peace, or such other inferior courts as may be by law established.*"

7.   By this section, the framers of the Constitution divide criminal procedure into the two most general heads, namely, proceedings by indictment, and proceedings in the absence of an indictment or by information. It asserts, in effect, as a general proposition, that every person charged with an indictable offense, shall be entitled to have it passed on by a grand jury. Then follow the two, solitary exceptions. Notaries public do not fall within the exception, unless they are "justices of the peace," or fall within the designation of "such other inferior courts as may be by law established."

8.   A notary is, in no sense, a justice of the peace. The Constitution recognizes the two, as distinct classes of magistracy. It speaks of justices of the peace, and of notaries public. Because it refers to the civil jurisdiction of justices, in defining the civil jurisdiction of notaries, it does not constitute a notary a justice. If it did, a justice might, with equal propriety, be called a notary. Nor is a notary *ex-officio* a justice of the peace, though popularly so called. Acts of the legislature establishing city courts, generally provide that the clerk shall exercise all the powers of clerks of the Circuit Court; but this does not constitute the clerk of the City Court, *ex-officio* clerk of the Circuit Court. The very act under discussion, purports to confer upon justices, &c., concurrent jurisdiction with the Circuit Court, &c.; but this does not make the justice *ex-officio* judge of the Circuit Court. Had the framers of the Constitution intended that notaries should be *ex-officio* justices, they would have so de-

clared. In the charters of cities, it has been frequently declared that the mayor should be *ex-officio* a justice of the peace—thus showing legislative recognition of the distinction.—Acts 1872-3, p. 364, § 22.

9. Nor does a notary fall within the designation of such other inferior court as the legislature may by law establish. Because, the legislature, under the power granted to establish inferior courts, can establish no court established by the Constitution. It can only create such courts as are not constitutional courts. Courts of notaries and justices *are* created by the *Constitution*, and do not, therefore, remain to be created by law. The term "inferior courts," as used in the 8th section of the Declaration of Rights, is used in the same sense as in other portions of the Constitution.

JOHN W. A. SANFORD, Attorney-General, *contra.*—1. The Constitution of the State recognizes two classes of notaries public. To one class, in addition to the powers given by the law merchant and recognized everywhere in the mercantile world, it gives the judicial authority pertaining to a justice of the peace. To the other class nothing is granted beyond the power conferred by the law merchant.—Constitution of Alabama, Art. VI. § 26.

2. The first class of notaries public is equal in every respect with justices of the peace. The title to the office is derived from different powers; but in everything else they are identical.

3. There is nothing in the Constitution of the State that forbids the general assembly to make the jurisdiction of the justices of the peace over misdemeanors, co-terminous with the county. This power it has exercised. In Lee county, the jurisdiction of justices of the peace over misdemeanors is concurrent with that of the Circuit Court.—Bill of Rights, § 9; Acts 1876-7, p. 197. The act which confers this power violates no provision of the Constitution, and is, therefore valid.

4. But the notaries public having the jurisdiction of jus-, tices of the peace within precincts, have the same power conferred on them in Lee county as has been granted to the justices. Therefore, as the case at bar was within the jurisdiction of a justice of the peace it was within that also of the notary public, and the court committed no error in its action.

BRICKELL, C. J.—On the 8th of February, 1877, an act of the general assembly was approved, which confers on justices of the peace and notaries public, having like pow-

ers, in several counties, and of them the county of Lee, original jurisdiction concurrent with the Circuit Court, of all misdemeanors committed in said counties.—Pamph. Acts 1876-7, p. 197. The single question this case presents, is the validity of this enactment, so far as it confers jurisdiction on notaries public.

The ninth section of the first article of the Constitution authorizes the general assembly to dispense with a grand jury in prosecutions for misdemeanor, and to confer on justices of the peace, or such other inferior courts as may be by law established, jurisdiction of such prosecutions. The twenty-sixth section of the sixth article prescribes the number of justices of the peace—the mode of their election, and the extent of their civil jurisdiction, and concludes: "*Provided*, That the governor may appoint one notary public for each election precinct in counties, and one for each ward in cities of over five thousand inhabitants, who, in addition to the powers of notary, shall have and exercise the same jurisdiction as justices of the peace within the precincts and wards for which they are respectively appointed. *And provided*, That notaries public, without such jurisdiction, may be appointed. The term of office of such justices and notaries public shall be prescribed by law."

Notaries are of ancient origin, long known to the civil and common law. Originally, a mere scribe, taking notes or minutes, and making drafts of writings and public instruments, his duties were extended with the growth of commerce, and became more frequent in attestation and authentication of instruments peculiar to maritime law, or the law merchant. Hence, because of the credence which all civilized nations attach to his attestation and authentication of such acts, to facilitate commercial intercourse, it is said he is an officer known to the law of nations.—*Kirksey v. Bates*, 7 Port. 529. Statutes have been enacted regulating the manner of his appointment, and to some extent defining his duties. These duties were strictly ministerial—with judicial power he was not clothed, nor was he charged with any judicial duty. The Constitution does not create the office. It recognizes its existence, and provides for the mode of filling it. The character of its duties, as defined by the common law, or the law merchant and maritime law, which had become incorporated into our common law, and by statutes, relating peculiarly to the authentication of instruments, intended as matter of evidence at home and abroad, rendered it peculiarly proper that the head of the executive department should be clothed with the power of appointment to the office. The Constitution authorizes the governor, when

appointing, to limit his power and duty, as it was confined by the common law and existing statutes, to ministerial power and duty, or to authorize him to exercise the jurisdiction of a justice of the peace. It is argued, that as the power of the governor to appoint, and clothe with the jurisdiction of a justice of the peace, is found in the form of a proviso, to the section of the Constitution which defines the civil, and is silent as to the criminal jurisdiction of justices, that the jurisdiction the governor may authorize the notary to exercise is the civil jurisdiction defined in the preceding part of the section. It is a general principle, that the natural and appropriate office of a *proviso* to a statute, is to restrain or qualify some preceding matter, and upon sound principles of construction it should be confined to what precedes, unless it is clear that it was intended to apply to subsequent matter.—*Rawls v. Kennedy*, 23 Ala. 240; *Pearce v. Bank of Mobile*, 33 Ala. 693; Potter's Dwarris, 118. A *proviso*, says BALDWIN, J., "in deeds and laws is a limitation or exception to a grant made or authority conferred; the effect of which is to declare that the one shall not operate, or the other be exercised, unless in the case provided."—*Voorhees v. Bank of U. S.* 10 Pet. 471. In *Wayman v. Southard*, 10 Wheat. 30, it is said: "The proviso is generally intended to restrain the enacting clause, and to except something which would otherwise have been within it, or in some measure, to modify the enacting clauses." Another purpose for which it is often employed, is to exclude some possible misinterpretation of the general words of the enacting clause, as extending to cases not intended to be brought within its purview.—*Minis v. U. S.* 15 Pet. 423. It does not necessarily follow because the term *provided* is used, that which may succeed it is a *proviso*, though that is the form in which an exception is generally made to, or a restraint or qualification imposed on the enacting clause. It is the matter of the succeeding words, and not the form, which determines whether it is or not a technical *proviso*. This and similar rules of statutory construction, are of limited application in the construction of the Constitution. "Rightly understood and rightly applied, they undoubtedly furnish safe guides to assist us in the task of exposition. But they are susceptible of being applied, and indeed, are often injuriously applied to the subversion of the text and the objects of the instrument."— 1 Story Const. § 448. The safe rule of constitutional construction, is to regard, not so much the form or manner of expression, as the nature and objects of its provisions, and the end to be accomplished, giving its words their just and legitimate meaning. The provision of the Constitution under

(26)

[Judge v. The State.]

consideration is obviously intended to confer on the governor
the power of appointing notaries public; and in appointing,
either to clothe them only with the powers appropriate to
their office, as they were defined by existing laws, or in addi-
tion, with the same jurisdiction as justices of the peace.
That jurisdiction was defined, not only by the preceding
part of the section, to which this provision is attached, but
by section nine of the first article, and by laws which had
been passed pursuant to it, under a similar provision in the
Constitution of 1865 and 1868. No particular significance
can be attached to the form, except that the general power
of the qualified electors of each election precinct to elect two
justices of the peace, is not to exclude the power of the gov-
ernor to appoint notaries, having like jurisdiction. Nor
should the power of the governor to appoint such notaries,
as is expressed in another provision, having the mere form of
a *proviso*, exclude his power to appoint notaries without such
jurisdiction. If the governor has, or may, in the county of
Lee, and the other counties named in the act of the 8th
February, 1877, as it is admitted in this case he had, ap-
pointed notaries with "the same jurisdiction of justices of
the peace," we cannot doubt the notary is clothed alike with
the civil and the criminal jurisdiction of a justice, whether
that jurisdiction is defined by section twenty-six of article
six, or by section nine of article one, or by statutes which
may have been, or may be enacted in reference to justices.
This was the ruling of the Circuit Court, and its judgment is
affirmed.